22-1291 and 1292. We'll hear from Mr. Schmidt. Good morning, Your Honors. May it please the Court. It is undisputed in this case that Ms. Cepeda Ibarra had chronic, progressive, and terminal condition of very severe pulmonary arterial hypertension and associated congestive heart failure. So Mr. Schmidt, can I say, this case really to me boils down to the question of how we can or should disagree with the district court's overall assessment of the evidence in the record, which I realize includes the report from Dr. Duncan, which you, I mean, I'm prepared to believe it's a much better report. Also, a brief assessment from Dr. Stahl, but we don't usually go back and take on the role of fact finder ourselves, and I don't see you, but please correct me if I'm wrong, I don't see you as making any legal argument about what was wrong with the way Judge Miller handled this. So is this really, you're just asking us to disagree with the factual weighing? We're making two principal arguments, Judge Wood. The second argument that we made was that Judge Miller applied the wrong legal standard when he cited the 18-month threshold. But he said, he doesn't even say that in a completely rigid way. He says 18 months or some other short period of time. He throws in kind of a more judgmental thing. Are you arguing that he thinks he's bound by law to the same standards that the BOP would use, which of course would be a mistake? Your Honor, we've done so many compassionate release cases, we know the fundamental standard is extraordinary and compelling circumstances. But the judge didn't cite that. He said 18 months or some other shorter standard, as you correctly quoted. We don't understand why he would cite the 18-month standard if he wasn't somehow influenced or relieved. He's flexible about the exact duration. But it's clear, at least it reads as if he thinks there has to be some duration short enough to allow immediate release. And I don't know where that comes from under the law. And then he says for that reason and that reason alone, the court denies her petition for compassionate release. Judge Hamilton, you're correct. This has to be short enough is not anything that's found in the law. The only standard is extraordinary and compelling circumstances. Could I ask you, what do we know about Ms. Ibarra's current condition? I'm glad you asked, Your Honor. I didn't know if you would. She was transferred to a BOP medical facility on January 5, 2022. After the filing of the motion, correct? Yes, Your Honor. Yes. The timeline here was Dr. Duncan submitted his report on December 7th. The BOP, the prison officials suggested to the family they visit Ms. Sepeda Ibarra within a week. The next day we filed our emergency motion for compassionate release December 8th. And then she was not transferred to the medical facility until January 5th. Hadn't she refused it for the transfer, given that she wanted to stay in her family? I thought there was evidence of that. No, her family is actually here in the Midwest and she was in California. So I don't believe that's correct, but I could be mistaken about that. But here's what's shocking. And I don't mean to get you off track for Judge Hamilton's question of her current status. Thank you, Your Honor. Here's what's shocking. She did not see a doctor. What is her current status? She's alive. She is not able to be treated with a continuous infusion, to my knowledge, because the doctor she eventually saw in April said he did not specialize in hypertension. So, she is now living on borrowed time. She is just beyond the 8.4 months that Dr. Duncan concluded based on his... Does she have pulmonary fibrosis? I don't believe so, Your Honor. That was the element in that study with the 8.4 months. Oh, the IPF. We don't know definitively whether she does. She has symptoms that are consistent with it. One of the key symptoms of IPF is that she has shortness of breath, and as Dr. Duncan documented, and it's undisputed, she has severe shortness of breath with any activity, literally any activity. This is an unusual compassionate release case, Judge Wood, to get back to your question, in that the clinical director, the director of medicine at the hospital, in a compelling medical opinion... Well, he has specific data, doesn't he, about ejection fraction and the like. Absolutely. Very specific data, consistent with the literature that was based on, that yielded her life expectancy, whereas the Stahl report, which isn't even signed by Dr. Stahl. It's signed by somebody else, and we don't know who that person is. That report simply says, we don't know. We can't tell you what her life expectancy is, and they just punted the issue. The report from Stahl, I hesitate to say Dr. Stahl, because it's not signed by her, says she does not have end of life indicators that would establish a prognosis of terminal at this time, but in previous sentences, just three or four sentences before that, the Stahl report acknowledges that she is terminal, but she does have those end of life factors in spades. She has significant shortness of breath with any activity. She cannot walk on her own. She is bedridden, confined to a wheelchair. According to Dr. Duncan, her treating doctor and the person who oversaw her medical care, she requires continuous infusion of the drug trepropestanil, and she has severe limitation of activity. Those are all end of life indicators, and this document review, the way it was done, Dr. Duncan's report was on December 7th. We filed our emergency motion on December 8th, and this records review report suddenly emerged on December 9th, unsigned by the person who had not given a copy of it until January, after we had submitted our initial briefing. Why wouldn't the last paragraph of, or second to last paragraph of the court's order, where he essentially goes through 3553A factors. Your Honor, the judge. And I know the court said that the court wasn't emphasizing these, or the court emphasized this was not the basis of his ruling. He made the factual findings and found that her life expectancy, he didn't believe, was less than 18 months, or any duration short enough to allow. But he does go on and essentially do a 3553A analysis. Why wouldn't that make any mistake in the standard harmless? Your Honor, I don't believe that Judge Miller in fact did a 3553A analysis. I think he was speeding this court's appellate review, assuming it would go up on appeal, so that you would know some of these other facts, like how long in her sentence she was, and some of the background on her case that you might find in our statement of the case. He was speeding that review, but in my reading of Judge Miller, I take him at his word that this was not anything that he relied on. What he relied on solely was not finding a long enough short life expectancy. Whether it's 18 months or something different than that, we don't really know. Why provide that for the basis of review then? I think just to put it in context, but if you look at the entirety of his two and a half page order, I do not see 3553A analysis. In fact, 3553A isn't even cited in Judge Miller's order. So in this particular case, we have a clear compelling report, and this is why this makes it an unusual case on the abuse of discretion standard. We have a clear, compelling report by the person that actually met with and physically examined and oversaw the treatment of care of Ms. Spadavera versus this rushed records review report that is internally contradictory. Well, you point out in your brief that there may have, on paper, had a job, but she wasn't going to the job because she couldn't, as I recall. She physically couldn't work, Your Honor. She may have had an assignment, but we found that disingenuous in the Stahl report. If I may, I'd like to reserve the rest of my time. Thank you, Mr. Schmidt. Mr. Holler? Good morning, Your Honors. May it please the Court. The District Court did not abuse its discretion in denying the defendant's compassionate release motion here. There's no doubt that the defendant suffers from severe pulmonary hypertension and shortness of breath, but the District Court acted within its rights in concluding that those health conditions were not so severe as to justify the extraordinary remedy of compassionate release. It was quite— Would it be an abuse of discretion not to grant it? Because I'm looking at her, and it's unusual to see a District Court writing, as Judge Miller did, for that reason and that reason alone, you know, the duration. The Court denies her petition, then he underscores it again in the next sentence. For the sake of any reviewing Court, the Court adds these findings while emphasizing they are not the basis of the case. I don't see that. He's telling you he just doesn't think she's going to die fast enough, but the evidence in the record is pretty weak on her, you know, prospects of living for a while. Well, Your Honor, I would disagree slightly with that characterization. I mean, I think in terms of your first question of why the District Court wrote the opinion the way he did, this Court, I think in Thacker and in various other cases that it's published, has set forth a pretty clear two-step standard. And the first step is, has an extraordinary and compassionate—has an extraordinary and compelling reason been shown? And he answered that question, no. Because it matters that he— He doesn't think she's going to die soon enough, you know, but the—but I don't know what duration he's thinking about, like next week, would that be enough? Or, I mean, the BOP general guidelines, which of course are not binding on him, might say 18 months, but this is a—it's just a disturbing approach to it. I don't see why it's not extraordinary and, you know, compelling. Well, Your Honor, I think that the—I think the question here is simply whether the District Court should accept Dr. Duncan's opinion, because that's the opinion that essentially says she has a short time left to live. Dr. Stahl, in reply, said that she did not believe that end-of-life indicators were present, that any term of 18 months or less was left to live. But she's relying on inaccurate information in part. We don't know how much that influenced her opinion and how much it didn't, of course. Dr. Duncan appears to be relying on inaccurate information in part, too, in terms of his finding of 0.7 years appears to be directly tied to that 0.7-year finding of IPF patients. I mean, the study that he is citing—first of all, there's no evidence she has IPF. And second of all, that study says people who have SPAPs higher than 50 live, on average, 0.7 years or less, and people with IPF beyond that live an average of 4 years. Her SPAP has been far beyond that for more than six years. And her numbers were where they were before she was treated by the University of Michigan. They got better. Then Michigan discontinued her because she discontinued herself and committed these crimes. And Northwestern and Stanford and BOP itself in 2019 said, we think that you would be best off in a federal medical center where we can give you this high-level, cutting-edge treatment. And she—I mean, BOP could have disregarded her wishes. I recognize that. But they accepted her wishes to be with family in California. So now, what Dr. Stahl says in her report and what BOP said is, rather than immediately order her release, immediately throw up our hands and say we can't treat her. And BOP has released, compassionately, many people over the last few years. They said we should take her to the next step. We should take her to Carswell. They took her down to Fort Worth, right? To Fort Worth. She can be treated at Parkland, which is where their facility—this is where their BOP facility that specializes in pulmonary hypertension is. This is where she has to go. She has no family there. I understand there are reasons she may not want to go there. And there are reasons she may want to be with her family. This is the best BOP can do. She has met with doctors. Judge Hamilton, she is scheduled to meet with a specialist next month. She has been determined—I think they have changed her medications. They have not put her on the highest levels yet. But she's being treated instead. I mean, I'm disagreeing with Dr. Duncan's opinion, so I suppose I'm not agreeing with him completely. But he's in a general—this is a general prison. He's dealing with everything. So it's just the difference between a GP seeing somebody and a specialist at Northwestern or anywhere else seeing somebody. But not Dr. Stahl. I mean, she doesn't know anything. And she doesn't see him. See her. She doesn't even see him. Well, Dr. Stahl is a reviewing physician, as are many of these other people on these papers like— Right. So I'm just saying you don't have Dr. Stahl, the great expert, against— There's no doubt. But again, if things have developed over the next six months, he's perfectly free to do what he did before, which is dismiss his appeal and go start this process over and get all of this new information in the record. We're here appealing that decision. Is he able to pursue both simultaneously? Or does the pendency of this appeal preclude a filing of a new motion? I don't know that any court has ever resolved that question specifically, Your Honor. I mean, I don't know that we've been there yet. I don't think there's anything in any BOP regulation that would preclude her seeking additional BOP review. I would think there would be some jurisdictional issues with her pursuing something in the district court. Very frankly, my concern is that we are not going to be very good at evaluating the doctor's reports and making medical judgments about Ms. Ibarra. It is easy for me to imagine that no matter how sick Ms. Ibarra is, a district judge could, without abusing his discretion, choose to deny compassionate release, given criminal record, her ability to commit crimes while she was very ill, et cetera. That's not the question in front of us right now. What I'm concerned about, in essence, is this very unusual analysis from Judge Miller that says, I'm only denying this because her life expectancy is not short enough to allow release, which looks to me like a legal error. I don't think, I don't, I mean, I've done the best I can to explain that in the brief, Your Honor. I understand. All I can do is refer you to Docket Entry 61 and just say, I mean, here's what happens. A defendant files a motion and says, I should get compassionate release. Here's why. Okay. And then the court generally is going to either say, yeah, I think COVID, I think pulmonary hypertension, I think your stroke counts, or I think it doesn't. So here, her argument was, I mean, the very first paragraph is, I have less than 18 months left to live. Therefore, grant me release. And then throughout, she sort of makes other statements that, well, even if it's not 18 months, it's short enough to justify my release. So he's just responding to that. And it's Docket Entry 62. I apologize, Your Honor. Okay. But I just view that in context of a district court judge gets a motion and she says, I have 18 months or about that, a really short period of time to live. And he says, reviewing this, reviewing these medical records, reviewing these reports, I'm doing the best I can. I don't think I have any reason to think that Dr. Duncan's opinion is better than Dr. Stahl's. Dr. Stahl has said BOP is going to transfer her. BOP is going to look at things. She is free to come back. BOP itself might decide they can't treat her. And that's where we are. And then he does not go on to, I agree, he doesn't go on to the second step. I mean, we didn't argue the second step here because Judge Miller said he didn't go to the second step. If the court disagrees and thinks that either she's shown an extraordinary and compelling circumstance or he hasn't said enough, then the remedy, I guess, is to remand so that he can consider the second step. I mean, I read this and I think, absent something compelling that she comes out with, nothing different is going to come with the second step. And the best thing to do here — Or even the first step. I have some pause. First of all, he doesn't mention extraordinary and compelling. I know he cites the statute, but he doesn't mention the extraordinary and compelling. And the language about not short enough to allow immediate release suggests that he thinks there's some magic number. I don't see that, Your Honor. We all have a life expectancy, right? I mean, an actuary could come in and stamp a number on everybody's head here. They could. I mean, I don't want them to, but they absolutely could do that. And so the fact that my life expectancy or your life expectancy isn't short enough to justify your release if we've committed a major crime, that's how I read that. I think that is how I've read Judge Miller's opinions for 20 years. That is how I would read that. I mean, Mr. Schmidt's read him for 20 years, longer than 20 years, so I'm sure he'll have a different opinion of that. But that, I think, is in context what it means. We've been reading his opinions for a while. Is this a really short life expectancy? Is this something that she's – and, I mean, I would read that in context with the rest of this. Is it short enough that given how serious her crimes are, given that she was essentially just as sick as she is now, honestly, her numbers are pretty much right where she was when she was committing these crimes, and that she's only served a third of her sentence, would I let her out? I mean, maybe at some point if she served three-quarters of her sentence or longer, would the district court judge change? Sure. And so I don't think Judge Miller is wanting to put anything in here that is going to preclude her from coming back if medical records change or if we get long enough into the sentence. But I do think that the district courts – we're reviewing this for abuse of discretion, and it is basically a factual challenge, and I think the district court did not abuse its discretion in finding the facts, did not commit in any error of law, and, therefore, subject to her going back to BOP and trying again what she's free to do, the judgment should be affirmed. Okay. Thank you very much, Mr. Holler. Mr. Schmidt, brief rebuttal. Very brief, Your Honor. I want to address the government's specific intention that her SPAP numbers are kind of basically consistent for the last few years. Here's the undisputed fact, and it's cited in both reports, including the otherwise flawed Stahl report. On December 3, 2021, four days before the BOP notified her family to come visit her within the week, and Dr. Duncan issued her report, she had her last heart catheterization, and that heart catheterization showed that her disease was worsening. So the fundamental fact here and undisputed was that her pulmonary arterial hypertension and associated congestive heart failure was worsening, things were getting worse. Lastly, about IPF, the doctor on the ground who saw her, who examined her, who took care of her care, he saw that she had the symptoms of IPF, and that's why I believe he cited that study, and it's unrebutted in the Stahl report. Okay. Our thanks to both counsel. The case is taken under advisement.